Argued November 14; affirmed November 21, 1939

McBEE ET AL. *v.* SCHOOL DISTRICT NO. 48 OF
CLACKAMAS COUNTY ET AL.

(96 P. (2d) 207)

122

Department 1.

*Arthur G. Beattie,* of Oregon City (Schuebel & Beattie, of Oregon City, on the brief), for appellant.

*Charles T. Sievers,* of Oregon City (Stanley Mitchell, of Oregon City, on the brief), for respondents.

ROSSMAN, J.  This is an appeal by one of the five plaintiffs from a decree of the circuit court which dismisses their complaint.  The purpose of the suit was to enjoin the defendants, one being School District No. 48 of Clackamas County, another being the clerk of that school district, and the remaining three constituting the district's board of directors, from purchasing a schoolhouse site, from erecting a building thereon and from issuing the district's bonds and warrants in order to finance, in part at least, the first two purposes. It seems that financial assistance is expected from the federal Works Progress Administration.  The complaint avers that the election proceedings leading to the grant of authority, upon which the defendant officials depend, were conducted in disregard of the controlling statutes.

At the present time there is only one schoolhouse in the defendant district.  It is forty-seven years old. The number of children in the district and the adequacy or possible inadequacy of the present school facilities are not mentioned in the record.  The defendant school clerk's minutes indicate that at a meeting of the school board held on December 19, 1938, a Mrs. Ferguson, as representative of the local Parent-Teacher Association, "talked about having a new schoolhouse."  According to the defendant clerk, "Mrs. Ferguson said they wanted a new school and she was sent there to represent it. * * * Everybody wanted a new building because it is such an old, old building."  According to

the clerk's minutes, apparently read from the witness stand, the board told Mrs. Ferguson to "go ahead and find the site or give them some reasons for calling a meeting." In the early part of 1939 the defendant directors voted favorably upon a resolution that an election be held "for the purpose of voting on the acquisition of property described as follows: * * * in the County of Clackamas and State of Oregon * * * Beginning at the Southeast corner of Block B in the plat of Park Place as per duly recorded plat thereof on file in the office of the County Recorder of Clackamas County, Oregon; running thence westerly on the southerly line of said Block B, 457.4 feet more or less to the westerly line of Center Street, extended; thence northerly at right angles 587.4 feet westerly from the North line of said Block B to the N. E. corner thereof; thence Southerly along Easterly line of said Block B to the place of beginning, containing 5.12 acres more or less, * * *'' The resolution stated that $3,000 was the sum needed to effect purchase of the tract and asked that the voters, besides deciding whether or not to buy the site, also determine whether "to bond the district for the purpose of purchasing the above-described property and building a new school building thereon." We quoted these two portions of the clerk's minutes because they are the only parts of her record which the parties have rendered available to us.

February 8, 1939, notice of the proposed election was posted. It recited the same description of the property to be acquired as that quoted in the preceding paragraph.

March 1, 1939, the election was held. The ballot contained two proposals. The first was: "Shall the

school board be authorized to issue Negotiable Interest-Bearing Warrants in the amount of $3,000.00 to purchase the following described property." Here followed the same description as quoted above. The second proposal was: "Shall the school board be authorized to issue Negotiable Interest-Bearing Warrants in the amount of $14,750.00 to erect a schoolhouse on the above described property?" A majority, but less than two-thirds of those who voted, cast their ballots in favor of each proposal.

Later, the school board found that the vote cast on March 1 did not authorize the incurrence of an indebtedness for the construction of a building, and, according to a stipulation of the parties to this suit, the following then occurred: "On the 26th day of April, 1939, a school election was held in said district for the purpose of voting upon the question of issuing said bonds for the purpose of building a new schoolhouse on said proposed new site, and at said election 146 electors voted for, or in favor of the issuance of said bonds, and 142 electors voted against said proposition."

As a matter of fact, there is an error in the above-quoted description of the desired tract. An option instrument held by the defendant district describes it as follows: "Beginning at the South East Corner of Block B in the plat of Park Place as per duly recorded plat thereof on file in the office of the County Recorder of Clackamas County, Oregon; running thence westerly on the southerly line of said Block B, 457.4 feet more or less in the westerly line of Center Street, extended; thence northerly at right angles 587.4 feet to the Northerly line of said Block B at a point 457.4 feet westerly from the Northeast corner of said Block B; thence Easterly on the Northerly line of said Block B to the

N. E. corner thereof; then Southerly along Easterly line of said Block B to the place of beginning, containing 5.12 acres more or less.'' The option is dated February 4, 1939, and, according to the defendant school clerk, was read at a meeting of the board when about 150 persons were present. At that time, according to the same witness, the aforementioned resolution was adopted. Subsequent to the election of March 1 warrants to the extent of $3,000 were issued and sold. The district now possesses the proceeds.

The complaint alleges that the defendant officials propose (1) to sell the aforementioned school warrants (in fact, the sale had been made before the complaint was filed) and employ the proceeds in the purchase of a site for a new structure; (2) to sell district bonds to the extent of $14,750 and with the money derived from them build a new schoolhouse upon the new site and then vacate the present structure; and (3) ''that while the ballots on which the votes were taken on the question of issuing said bonds definitely showed that it was the intention of the defendants to build a schoolhouse with the proceeds of the bonds on said new site, the ballots did not show that said new schoolhouse was to take the place of the old schoolhouse on the old site, but in truth and in fact it is the intention of the defendants that said proposed new schoolhouse on the new site shall take the place of the old schoolhouse on the old site.'' The appellant further contends that the circuit court erroneously excluded evidence which had it been considered would have shown that the directors intend to abandon the old schoolhouse when the new one has been completed. Next, the appellant contends that since the site was erroneously described in the resolution, in the election notice, and upon the

ballots, no authority has been granted to issue either warrants or bonds, or to pursue any course concerning the purchase of a site or the construction of a building. Finally, the appellant contends that since the resolution employed the term ''to bond the district'' and the ballot used the phrase ''to issue negotiable interest-bearing warrants,'' no authority to issue warrants was granted.

■■ A school district may have as many school-houses and schoolhouse sites as it desires: *Landers v. Van Aukin*, 77 Or. 479, 151 P. 712. A majority of the voters participating in an election or meeting suffices to authorize the school board to acquire a schoolhouse site or build a school building: §§ 35-1103 and 35-1112, Oregon Code 1930. However, according to the section last cited, ''It shall require a vote of two-thirds of the voters present and voting at such meeting to order the removal of the schoolhouse.'' The words ''the removal of the schoolhouse'' are not interpreted literally, but include a change in location whether the old structure is moved to a new site or is abandoned and a new building is erected in another location: *Lumijarvi v. School District No. 25*, 112 Or. 344, 229 P. 684. See also *Landers v. Van Aukin*, supra.

The first issue presented by the appellant which we shall consider is whether the record indicates that the defendant officials have done anything or contemplate doing anything in violation of the above two-thirds rule by reason of which a decree against them should be issued.

In a preceding paragraph we stated that the minutes of the defendant school clerk indicate that the proposal to acquire a new site and construct a new building was mentioned at meetings of the school board only twice.

The first instance occurred December 19, 1938. Nothing was done at that time except to listen to a proponent of a new schoolhouse. The only other reference in the minutes concerning the purchase of a site and the construction of a building is quoted in the second paragraph of this decision. As is stated there, the board voted that an election be called for the purpose "of voting on the acquisition of property described as follows: * * *" and "to bond the district for the purpose of purchasing the above described property and building a new school building thereon." The ensuing election must have been succeeded by another board meeting concerned with the proposal because on April 26, 1939, as the stipulation signed by the parties indicates, an election was held at which the board was given authority to issue bonds—not warrants—to finance the construction of a schoolhouse on the contemplated site. What was done at that board meeting is not disclosed by the record before us. But apparently at some meeting of the board the warrants authorized on March 1 by the voters were sold and a building committee was appointed. We also observe that one of the defendant directors, Frank Peckover, in response to a question asking whether an architect had been hired in connection with the new schoolhouse, answered "Yes, sir." Hence, we must amend the statement just made concerning the defendants' transactions by adding that they also hired or consulted an architect.

■ Thus, the only records before us which reveal the transactions of the defendant officials concerning the purchase of a site, the construction of a building and the incurring of indebtedness show no violation and no contemplated violation of the two-thirds rule. They indicate that the school board has called two elections

in the course of which the voters made known their views. They have sold $3,000 of school warrants, appointed a building committee, and, possibly, hired an architect. For the sake of clarity, we add that the records do not indicate that the defendants have taken any other actions than as just indicated. The district still possesses the $3,000, and has not exercised the option which was given for the schoolhouse site. The directors have not purchased the property nor have they started construction of a building. It is clear that the school activities cannot be moved from the present structure to another until two-thirds of the voters casting ballots in an election favor the removal. It is likewise clear that the directors know that they cannot move from the present building to a new one until a two-thirds vote authorizes them to do so. For instance, Mr. Peckover, the aforementioned director, was asked and answered as follows:

"You were aware at all times that it would take a two-thirds vote of the voters of the district present and voting at any elections to move to the new schoolhouse, weren't you? A. Yes, sir."

Elvin Charles, another of the three directors, in answer to a leading question which assumed that he favored the construction of a new building, replied:

"Well, my purpose it is to hold school in, but so far as of the district, we understand we had to have an election, two-thirds majority, before we moved the school."

He was then asked:

"But it is the purpose to move into it as soon as you get it built, is it?" and answered, "No, not until election is held to move the school; we do understand that thoroughly."

But the appellant contends that "parol evidence is admissible to supplement the minutes of the school clerk, or to explain things not fully covered by the record." He further contends that evidence presented by the plaintiffs, but rejected by the circuit court, shows that the defendant officials intend to move the school to the contemplated new structure after it has been built. Wigmore on Evidence (2d Ed.) § 2451, states: "Whether acts of a corporation must at common law be integrated in a written record is a question which has given rise to a great variety of opinions and of practice * * *." An examination of the comprehensive annotation appearing in 98 A. L. R. 1229, to which the appellant directed our attention, indicates that Wigmore's observation that this issue has "given rise to a great variety of opinions" is not mistaken. The section from which we just quoted continues: "Where such a record is made, the principle of voluntary integration (ante § 2430) may of course be applied, and the record made to control." The decisions reviewed in the above annotation indicate that they are not in harmony even upon this phase of the issue. We believe, however, that it is unnecessary for us to express an opinion upon the problem submitted by the appellant because (a) the evidence which the plaintiffs presented, and the circuit court rejected, upon the issue under review consists merely of talk by the defendant officials, and, although it may indicate that those who spoke will at some future board meeting vote to remove the school, it does not show that they have yet so voted; (b) the discussions and conversations by the board members, to which reference was just made, were not voiced during board meetings while the director was engaged in the performance of official duties. There-

fore, these offhand views and discussions, even if incorporated in the clerk's minutes, would not supplement them.

The nature of the evidence just mentioned is indicated by the following testimony, some of which was admitted and some of which was rejected. Peckover, the aforementioned director, testified that it was contemplated that when the new structure was under way the old one would be demolished and that part of its material would be used in the construction of the new building. He added that this was to be done "as soon as the project went through," but that so far there had been "no motions of the board * * * just a matter of discussion." Elvin Charles, another of the defendant directors, as a witness, indicated that he entertains thoughts of proceeding with the construction of a new schoolhouse. However, his testimony is susceptible to no interpretation other than that his mind is not yet made up. Although he had not testified that he was ready to vote for a new building, plaintiff's counsel asked him:

"What is the purpose of building the new school? Is it to take the place of the old one or not?"

He answered:

"Well, my purpose it is to hold school in, but as far as of the district, we understand we had to have an election, two-thirds majority, before we ever moved the school."

He swore: "We do understand that thoroughly"; that is, that a two-thirds vote is necessary before the present structure can be abandoned and a new one occupied. Then the following occurred:

"It is the purpose now, as I understand it, to build it and let it stand vacant until such time as you can get a two-thirds vote? A. (Witness nods his head)."

A. R. Sanatel, another member of the defendant board, was asked by plaintiff's counsel and answered him as follows:

"Q. And you have been present at the meetings where you discussed the tearing down of the old building? A. It has never been discussed officially in a meeting, just talking among ourselves.

"Q. Well, you have talked about it at the school meetings, haven't you? A. Just among ourselves, not as an official school meeting.

"Q. Not as an official school meeting. What did you talk amongst yourselves you would do with the old building?

"Mr. Beattie: I object to that as incompetent, irrelevant and immaterial.

"The Court: Objection sustained.

"Mr. Beattie: Offer it under the rule. Go ahead.

"A. What was that?

"Q. What did you discuss amongst yourselves you would do with the old building? A. We was just talking that we may use some of the old material if we could in the other building. We couldn't form any plans until after we had an election to do so.

"Q. Now, it is the purpose of the board to proceed and use this bond money to build the new school at once, isn't it? * * *

"A. The district asked us to build a new schoolhouse, and that is what we were figuring on doing.

"Q. On this new location? A. On this new location. They voted bonds for to purchase the location, and they voted bonds to build the new schoolhouse, and that is the intention of the board, to do what the district wants them to do.

"Q. And it is the purpose to move into it if, as, and when you get a two-thirds vote authorizing it? A. That question has never been brought up to the school board yet, what they are going to do with the building afterwards.

"Q. Well, you were present at the various meetings. What reasons were given for wanting a new school?

A. They just said they wanted a new school and wanted to purchase a new site to do it on. They haven't asked what they were going to do with it after they got it.

"Q. You haven't answered my question, what reasons were given? A. There were no reasons given. They just said they wanted a new schoolhouse. .

"Q. Why did they say they wanted a new schoolhouse? A. We haven't asked the district that.

"Q. You are evading the question. You know what I am getting at. A. Well, state what you are getting at.

"Q. Is it the purpose to build an additional school and run two schools, or is it to take the place of the old one? A. We was asked to purchase a new piece of property and build a schoolhouse on it, and that is what the school board has done, is to do what the school district asked them to do. We haven't been asked what they were going to do with it, or anything about it.

"Q. Did you talk to the school board yourself about building the material from the old school for a chimney house? A. No.

"Q. Have you been present at meetings at which certain people did make that proposition? A. No, that has never been mentioned that I know of."

The only other witnesses that the plaintiffs called upon the issue were the defendant school clerk, Mrs. Effie Smith, and a member of the district's budget and building committees. Mrs. Smith testified that on her behalf her daughter sent to each of the alumni of the school a postal card notice of the 1939 annual alumni meeting, saying, "May be the last gathering in the old school. Would like to make it a homecoming for all pupils who attend." When asked what she meant by the term "the last gathering," the witness explained: "It might be; I didn't know that it would be; I said it might be." Mrs. Smith testified that much had been said at board meetings concerning a new school. Plaintiff's counsel asked her whether the old

building would be abandoned when the new was completed and received the reply: ".Well, if two-thirds move over, if. they would move over in the new school building, I expect it would be, but then we haven't moved yet."

■ No one contends that Mrs. Smith's act in mailing the notices of the alumni meeting was done with the knowledge or approval of the school board. Nor does the appellant contend that the mailing of the notices was any part of the clerk's official duties. Apparently the mailing was done by Mrs. Smith as a member of the alumni body. The clerk, of course, has no authority to determine the policy of the board: §§ 35-1108 and 35-1203, Oregon Code 1930.

Harold Bernier, the aforementioned committee member, testified that when his committees met with the defendant school board a unanimity of opinion was expressed upon the following matter: "Well, we decided the school board—we talked it over with the architect and decided that in order to keep the costs down on our building, that we would take and use the material in the old building in the gymnasium part of the new structure. We would take and tear down the old one after the new academic rooms were completed, we couldn't do it before because the school was in use. We were going to use as much of the old material in the forms and upright structure of the school as we could, and we were going to sell the rest." The witness testified that this discussion and planning took place before the election of March 1. What, if any, plans were shaped after that election the witness did not mention. The budget committee included in the district's budget $85 for the purchase of new desks, anticipatory to the building of the new schoolhouse, and also

included the amounts needed to defray the interest requirements upon the bonds and warrants authorized by the preceding elections.

From McQuillin, Municipal Corporations (2d Ed.) § 602, we quote:

"All of the public or corporate affairs of the municipal corporations must be transacted in substantially the manner pointed out by the law. In the representative form these matters must be done at a legal meeting of the council or governing body. * * * The fundamental principle is that the affairs of a corporate body can be transacted only at a valid corporate meeting. Its legislative and discretionary powers can be exercised only by the coming together of the members who compose it, or those who are its duly constituted representatives—the legal corporate authorities—and its purposes or will can be expressed only by acts or votes embodied in some distinct and definite form. The existence of the council or governing body is as a board of entity, and the members thereof can do no valid act except as a board. In short the general legal rule is that, to bind the municipality, the council, or legislative body must be duly assembled and act in the mode prescribed by the law of its creation, evidenced by an order entered of record, and such act, if legislative in character, must ordinarily be by ordinance, by-law or resolution, or something equivalent thereto."

We believe that the quoted language correctly states the legal principle governing the issue before us. In the following recent cases it was held applicable to school boards: *Beers v. Lasher*, 209 Iowa 1158, 229 N. W. 821; *Fleming v. Board of Trustees*, 112 Cal. App. 225, 296 P. 925.

We repeat that the informal discussions and offhand conversations of the defendant officials were properly excluded by the defendant clerk from her minutes, and that the excluded testimony had no ten-

dency to supplement or explain her minutes. The court did not err when it held that this evidence was inadmissible.

■ We believe that in the foregoing paragraphs we have set forth a fair review of the evidence. We are satisfied that the evidence fails to show that the defendant officials have violated or contemplate the violation of any provision of § 35-1112, Oregon Code 1930.

■ It may be that the board members will decide, as the plaintiff anticipates, to build a new schoolhouse. But if they so decide they will be compelled to make some record of their decision in the clerk's minutes before they can enter upon the undertaking. So far they have afforded no opportunity to the voters of the district for expressing their wishes, through the medium of the ballot, upon the issue of whether the present schoolhouse should be abandoned in favor of a new structure upon a new site. As we have seen, such a course cannot be pursued unless two-thirds of the voters authorize it. Time yet remains to take the vote. Apparently the defendant directors are perplexed and do not know what should be done. We can find nothing in the record which could warrant a decree against the defendants. But let us assume that the defendant school board expects to purchase a new site and construct a new building. As just stated, they must make some entry in the public records of their decision before proceeding. There is nothing in the evidence which indicates that an additional schoolhouse is not needed. The number of young people in the district of school age, the adequacy or inadequacy of present school facilities, the taxable wealth of the district, etc., are wholly undisclosed by the record before us. The purchase of sites and the construction of schoolhouses after the voters have granted the necessary

authority are entrusted to the wisdom of the school board. Courts can interfere with the exercise of their authority only when they disregard it and pursue some unauthorized course. We dismiss the contentions under consideration as unsupported by the record.

The appellant contends that the elections failed to confer the desired authority because an erroneous description of the contemplated school site was employed in the election notices and upon the ballots used by the voters. Both the erroneous and the correct descriptions are quoted in preceding paragraphs. L. A. Henderson, an abstractor of titles with forty years' experience, was the only witness called by the plaintiffs upon this issue. He testified that a map cannot be made from the erroneous description, saying, "I don't think it is intelligible for platting. You could only be sure of two courses." R. S. Milln, a surveying engineer employed in the office of the Clackamas County surveyor, when handed a copy of the erroneous description, and asked, "Could you take your instruments and go up on the ground and locate that property with reasonable certainty?" answered "Yes." He said, "It is not a description that can't be followed out on the ground"; he added, however, that the part of the description which says "westerly from the north line of Block B" was obviously meaningless and must be disregarded. In tracing his course, the part of the description which says "thence westerly on the southerly line of said Block B 457.4 feet more or less to the westerly line of Center Street extended" gave Milln the southwest corner. He obtained the northwest corner by the use of that part of the description which reads "thence northerly at right angles 587.4 feet." Then, according to his testimony, since "the northeast corner is mentioned to go to, so you would have to go

easterly." The easterly line is clearly described. In this manner the witness found that the description affords one three monuments. We again quote from his testimony: "There is three monuments in that description, the southeast corner of B, the south line of B, the line at right angles to the south line, and the northeast corner, and the closing side." According to him, the northerly line, being a part of the boundary of Block B, is a known line since it can be identified from a recorded plat.

Section 63-102, Oregon Code 1930, reads:

"The following are the rules for construing the descriptive parts of a conveyance of real property, when the construction is doubtful, and there are no other sufficient circumstances to determine it: 1. Where there are certain definite and ascertained particulars in the description, the addition of others, which are indefinite, unknown, or false, does not frustrate the conveyance, but it is to be construed by such particulars, if they constitute a sufficient description to ascertain its application; 2. *   *   *"

From *State ex rel. Weatherford v. Hayworth,* 152 Or. 416, 53 P. (2d) 1048, we quote:

"Thus, it seems the last call was omitted in the description. However, it is clear from the entire description what territory was intended to be included and it was sufficiently certain and definite to enable a surveyor to ascertain and trace the true boundaries of the district *   *   *. In the light of the above admission and the well-established law applicable thereto, it is clear that the error in the description of the boundaries of school district No. 15 will not render invalid the organization of the union high school district."

█ The purpose of requiring the ballots to contain a description of the property submitted as a schoolhouse site is to enable the voters to identify it. There is no other purpose. Technical accuracy and complete free-

dom of error, therefore, are not essentials. In the present instance, only one parcel of property was mentioned upon the ballot, thereby lessening the possibility of any voter becoming confused. We observe from the record that on February 13, 1939, someone erected upon this property within fifty feet of the street a sign, four by ten feet in size, bearing in large letters the inscription, "New School Site, Proposed W. P. A. Project."

■ We believe that Milln's interpretation of the erroneous description is a reasonable one, and that being so, the facts now before us are substantially similar to those in the case from which we quoted. It is our opinion that this contention is without merit.

The appellant's final contention is based upon the fact that the resolution adopted by the school board, preparatory to the election of March 1, bore the phrase, "to bond the district," whereas the ballot used by the voters employed the term, "Negotiable Interest-Bearing Warrants." The words of the resolution were "to bond the district for the purpose of purchasing the above-described property and building a new school building thereon"; those of the ballot were "shall the school board be authorized to issue Negotiable Interest-Bearing Warrants in the amount of $3,000.00 to purchase the following described property * * *."

Appellant's brief quotes the following from I Words and Phrases Judicially Defined, 1st Series, p. 834:

"There is a vast difference between bonds and warrants. Warrants are general orders payable when funds are found, and bonds are obligations payable at a definite time, running through a series of years. They are payable when the time of their maturity arrives, independent of any presentation."

Oregon Laws 1939, Chap. 192, in amending § 35-1104, Oregon Code 1935 Supplement, says:

"When authorized by a majority of the legal voters * * * they (school directors) may, in the name and on behalf of their district, contract a debt by borrowing money, or otherwise, for an amount which shall not exceed five thousand dollars ($5,000) * * * for the purpose of building and furnishing a school building * * * or for the purchase of land for school purposes * * * and issue negotiable interest-bearing warrants of their district, evidencing such debt, and fix the time of payment of the same; * * *"

The election notices employed the term, "Negotiable Interest-Bearing Warrants."
The amended statute employed the word "warrants" in the same manner.

■ Undoubtedly the infinitive "to bond" was not used in the resolution in its technical sense, but as a broad term denoting a purpose to issue certificates or other financial documents whereby the district could employ its credit for the purpose of borrowing money. It will be observed that the law from which we just quoted uses the term "warrant" in such a manner that the difference between a bond and a warrant is narrowed, if not closed. While generally a warrant is issued after a debt has been incurred and for the purpose of enabling payment to be made, the above statute permits a warrant to be issued as a means of creating a debt. Under that statute there is not "a vast difference between" a bond and a warrant.

This final contention of the appellant is without merit, we believe.

We are satisfied that the appeal was presented in good faith; costs and disbursements will, therefore, be allowed to neither party.

RAND, C. J., and KELLY and BEAN, JJ., concur.